1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4
   UNITED STATES OF AMERICA,        )        3:20-CR-380-B
5              Government,           )
                                     )
6                                    )
   VS.                               )        DALLAS, TEXAS
7                                    )
                                     )
8  JASON SHEROD BALDWIN,             )
               Defendant.            )        July 31, 2020
9

10
          TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
11
              BEFORE THE HONORABLE DAVID L. HORAN
12
                UNITED STATES MAGISTRATE JUDGE
13

14
   A P P E A R A N C E S:
15

16
   FOR THE GOVERNMENT:          MR. MARTY BASU
17                              UNITED STATES DEPARTMENT OF JUSTICE
                                NORTHERN DISTRICT OF TEXAS
18                              U.S. Courthouse, Third Floor
                                1100 Commerce Street
19                              Dallas, Texas  75242
                                marty.basu@usdoj.gov
20                              (214) 659-8600

21

22

23

24

25

```
 1   FOR THE DEFENDANT:              MR. STEPHEN GREEN
                                    Federal Public Defender's Office
 2                                  525 S. Griffin Street
                                    Suite 629
 3                                  Dallas, Texas  75202
                                    stephen_green@fd.org
 4                                  (214) 767-2746

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18
     COURT REPORTER:                MR. TODD ANDERSON, RMR, CRR
19                                  United States Court Reporter
                                    1100 Commerce St., Rm. 1625
20                                  Dallas, Texas  75242
                                    (214) 753-2170
21

22

23          Proceedings reported by mechanical stenography and

24   transcript produced by computer.

25
```

```
 1          PRELIMINARY AND DETENTION HEARING - JULY 31, 2020
 2                      P R O C E E D I N G S
 3          THE COURT:  Okay.  Court will finally call the case
 4  of United States of America versus Jason Sherod Baldwin, Case
 5  Number 3:20-MJ-782-BN.
 6          MR. BASU:  Marty Basu on behalf of the Government.
 7          THE COURT:  Okay.
 8          MR. GREEN:  Stephen Green for Mr. Baldwin.
 9          THE COURT:  All right.  Back for preliminary and
10  detention hearing.
11          Are both sides ready to proceed?
12          MR. BASU:  Yes, Your Honor.
13          MR. GREEN:  Yes, Your Honor.
14          THE COURT:  Okay.  Mr. Basu?
15          MR. BASU:  I'd like to call the first witness, Agent
16  Mullican.
17          THE COURT:  Step up here and raise your hand before
18  we proceed.
19          (The witness was sworn)
20          THE COURT:  Thank you.
21      JENNIFER MULLICAN, GOVERNMENT'S WITNESS, SWORN
22                      DIRECT EXAMINATION
23  BY MR. BASU:
24  Q.   Agent Mullican, can you please state your name and spell
25  your last name for the record?
```

1  A.   Yes.  I'm Jennifer Mullican, and my last name is spelled

2  M-U-L-L-I-C-A-N.

3  Q.   And what do you do for a living?

4  A.   I am currently employed with the Dallas office of the

5  Federal Bureau of Investigation, and I'm assigned to a child

6  exploitation task force.

7  Q.   And what is your title?

8  A.   I'm a special agent.

9  Q.   How long have you been doing that?

10  A.   I've been a special agent for 17 years, and I've been

11  working crimes against children since 2013.

12  Q.   Can you briefly describe your duties and responsibilities?

13  A.   My main duty is to investigate crimes against children as

14  it pertains to the Internet, but we also handle kidnapping

15  matters, child trafficking matters, and online solicitation

16  enticement matters.

17  Q.   Are you familiar with the case against Mr. Jason Sherod

18  Baldwin?

19  A.   Yes, I am.

20  Q.   And how are you familiar with that case?

21  A.   I was assigned a lead from FBI Philadelphia, and the lead

22  was to further the investigation onto Jason Baldwin's online

23  activity.

24  Q.   Agent Mullican, do you see Mr. Baldwin in the courtroom

25  today?

```
 1   A.   Yes, sir, I do.
 2   Q.   Can you point him out?
 3   A.   He is sitting to my left, and he's in kind of a yellow-
 4   colored jumpsuit.
 5            MR. BASU:  Let the record reflect that the witness
 6   has correctly identified the Defendant.
 7            THE COURT:  It will.
 8   BY MR. BASU:
 9   Q.   Agent Mullican, can you please describe the investigation
10   that led to the prosecution of Mr. Baldwin?
11   A.   Yes.
12            FBI Philadelphia investigated a subject who was
13   advertising and selling child pornography files and links
14   online.  They executed a search warrant on his residence, and
15   they obtained electronic evidence from that residence.
16            During the course of their investigation, they
17   identified Mr. Baldwin as an individual that had purchased
18   links and child pornography from this particular individual, so
19   they sent down those records that they obtained in the course
20   of their investigation for us to further dig into, to determine
21   his online activity for the purchasing of child pornography.
22   Q.   And did you investigate Mr. Baldwin specifically?
23   A.   Yes, we did.
24   Q.   And what did you find?
25   A.   Well, I reviewed the records that Philadelphia had
```

1    provided, and the individual that was associated with the

2    PayPal account that was paying the Philadelphia subject had the

3    email account jbaldwin09@yahoo.com.

4            Also associated with that Yahoo account was a

5    particular cellular telephone number.  That cellular telephone

6    number revolved back to Mr. Baldwin.

7            Additionally, IP address information that was

8    utilized to access the account that was used to communicate

9    with the Philadelphia subject regarding the purchasing of the

10   child pornography files, those IP addresses revolved back to

11   Mr. Baldwin's prior address, his current address, and his place

12   of employment.

13   Q.   And, specifically, so what software did Mr. Baldwin use to

14   communicate with the individual in Philadelphia?

15   A.   He was using a third-party messenger application that's a

16   mobile-based application called Kik Messenger.

17   Q.   And with Kik -- so is the only way they can access that,

18   is that on a phone, or can you also access that on a desktop?

19   A.    It's predominantly a mobile application; however, if you

20   have forensic software, you can -- I don't exactly know what

21   it's called, but you can have it put on a desktop, but it

22   doesn't function the same.

23   Q.   Okay.  Aside from communications with the individual in

24   Philadelphia, did you find any other communications between

25   Mr. Baldwin and other individuals regarding -- regarding child

1  pornography?

2  A.   Well, based upon information that we received from FBI

3  Philadelphia, we were able to obtain a federal search warrant

4  for Mr. Baldwin's residence.  We executed that search warrant

5  on Wednesday, the 29th.  We interviewed Mr. Baldwin as well as

6  did an on-scene forensic preview of one of his cell telephones.

7        And Mr. Baldwin admitted to being the user of the

8  Yahoo account.  He admitted to being the user of the Kik

9  account.  He admitted to purchasing the links and the files of

10  child pornography.  He admitted to having an addiction to child

11  pornography and porn in general.  He said he had this addiction

12  for approximately eight years.

13        And on his device we were able to locate multiple

14  messages, not only with the Philadelphia subject but with other

15  individuals where he is seeking child pornography files.

16  Specifically, he's asking for boy-on-boy who are sucking and

17  fucking.

18        And I think I reviewed approximately 50 chats to

19  date, and that's pretty much the theme of the chats.  Within

20  the first message or two it's trade, trade, trade.

21        And more concerning to me is that he has identified a

22  particular victim series and he's aggressively asking for that

23  series throughout multiple conversations.

24  Q.   All right.  I want to back up a little bit.

25        So the -- the communications between Mr. Baldwin and

1   the individual in Philadelphia, so is that Mr. Baldwin is

2   soliciting certain -- or seeking advice or images from the

3   individual in Philadelphia?

4   A.   So the communication will begin -- so, yes, part of the

5   information that FBI Philadelphia sent down was username

6   information for their subject.

7        So in my review of Mr. Baldwin's communications, I

8   found user names that matched or were similar to their subject

9   in Philadelphia.  And with those, the communications,

10  Mr. Baldwin will say, "Do you sell or do you trade?"

11       And the individual advises that he sells them.

12       They discuss a price.  They'll discuss what they're

13  looking for.  Mr. Baldwin will regularly ask for boy-on-boy.

14  He'll ask for either sexual videos or videos depicting a child

15  undressing and masturbating.

16       And then the individual may send what they call

17  previews, which would be screenshots or thumbnail shots of the

18  particular video, how long the video is, and then the price of

19  the video.  So that communication is seen not only with the

20  Philadelphia subject but with other subjects as well.

21  Q.   And so the Philadelphia individual did, in fact, send

22  Mr. Baldwin actual child pornography?

23  A.   He would send him links.  They were either Mega links or

24  Drop Box links.  And these links would link to a folder that

25  would either contain the particular video that Mr. Baldwin had

1    asked for or in some cases he paid a certain dollar amount for
2    access to all the files within that particular link.  And then
3    those files would be files depicting child pornography.
4    Q.   Did you have a chance to review those files or some of the
5    files?
6    A.   Some of the files that I received from Philadelphia -- so
7    what Philadelphia did, is they submitted legal process to a
8    company called -- well, it's a foreign company.  So it's held
9    by the New Zealand Ministry.  And they submitted legal process
10   over there.
11          And if the link to that file was still active, they
12   sent the records to FBI Philadelphia, and FBI Philadelphia
13   provided those records to me.  And these records were the
14   records of the link purchased by Mr. Baldwin.
15   Q.   And those files, were they, in fact, files of child
16   pornography?
17   A.   Yes, sir, they were.
18   Q.   So I want to talk about the individuals in the actual
19   pictures or videos.
20          So what is the age range?  What was the age range
21   that you saw in those files?
22   A.   The age range estimated was probably, I'd say, 8 to 10 to
23   probably 12 to 15 years of age.  There were multiple videos
24   files that were sent.
25          In addition to that, when we interviewed Mr. Baldwin,

1   he admitted to -- we had screenshots of the videos.  We did not

2   show him the full videos, but we took screenshots of the

3   children depicted in the videos.  Mr. Baldwin recognized those.

4   But in addition to that, he also had files, video files and

5   image files of child pornography on his cell phone that we also

6   reviewed with him during the interview.

7          And the two particular files that we reviewed with

8   him during the interview, he identified one young man as 12

9   years old, approximately.  And then in another video that

10  depicted two young men having sex, he estimated their ages to

11  be approximately 12 to 13 to 14 years old.

12  Q.   All right.  So far you've referred to young men and boys.

13  Were there any girls in the videos?

14  A.   Occasionally, Mr. Baldwin would ask for files of girls.

15  He stated that his preference, his sexual preference was for

16  young boys anywhere from 13, 14, to 15 years old, but he said

17  he did -- he identified himself as bisexual, so he did

18  occasionally want files depicting females.

19         In his on-scene forensic review of the contents of

20  his phone, it was a short review, but we did observe both male

21  and minor -- minor male and minor female files on his phone.

22  Q.   In reviewing the messages between him, Mr. Baldwin and the

23  individual in Philadelphia, what was the price discussed for

24  some of these files?

25  A.   I observed -- in the Philadelphia communications, I

1   believe he was selling a link to a particular video file from

2   anywhere from $7.00 to $10.00 to $13.00 per video file.

3          I do recall at one point he purchased a few files for

4   $31.00.

5          In other communications, he's discussing with other

6   users that he has found an individual in a particular series or

7   group of files that he's looking for.  And this particular

8   individual wanted $150.00; however, he was able to negotiate

9   him down to $50.00.  But I've seen communications where they've

10  confirmed a sale of anywhere from $10.00 to -- on up to $35.00

11  to $40.00.

12  Q.   Now, you've made a couple references to a victim series or

13  a series.  Can you describe what that is?

14  A.   So in his chat communication -- we don't like to identify

15  the names of the victim series, but in his chat communication

16  he regularly asked for the names of two boys.  He's like, "Do

17  you have these two boys' names?"

18         And sometimes people will say, "I don't know who that

19  is."

20         And then he would ask for a different series name,

21  and then there was a third series name.

22         In the process between the search warrant and today,

23  I have reached out to the National Center for Missing and

24  Exploited Children and asked them to do further research on

25  those particular names so that we can try to identify if any of

1   those files are actually on his devices.

2   Q.   Are you familiar with the federal offense of advertising?

3   A.   Yes, sir, I am.

4   Q.   Can you describe what advertising is?

5   A.   Basically, anytime someone is trying to sell files of

6   child pornography is advertising; but also anytime any

7   individual is specifically seeking a particular victim series,

8   that falls into the advertising offense as well.

9   Q.   Are you familiar with the statutory penalties for

10  advertising?

11  A.   Yes, sir, I am.

12          THE REPORTER:  I'm sorry, I missed your question.

13  BY MR. BASU:

14  Q.   The statutory penalties for advertising?

15  A.   Yes, sir, I am.

16  Q.   Do you know what they are?

17  A.   I believe it's 15 to 30 years.

18  Q.   Now, with your analysis of the IP addresses, are you able

19  to determine where Mr. Baldwin was accessing these files or

20  accessing any of the apps that you have referred to?

21  A.   So, yes, in FBI Philadelphia's request for records, they

22  submitted legal process to the application Kik Messenger, and

23  they received records from Kik Messenger.  The company is

24  called MediaLab.  And these records covered the timeframe from

25  September of 2019 to June of 2020, I believe.

1          And in the course of those records, there were

2    multiple IP addresses provided over several days.  And in early

3    September, probably through October, the IP address to access

4    this particular Kik account, the Kik account he identified as

5    the account that he used to purchase these files, it was at his

6    previous residence as well as his place of employment.

7          And then I believe October, November timeframe

8    Mr. Baldwin moved from the previous address to the address that

9    was searched on Wednesday, and that is reflected in the records

10   as well.  The IP address now belonging to the new apartment is

11   in those records, as well as we continue seeing access to this

12   application from his school IP address.

13   Q.   And so let me just break that down.

14          You mentioned that he accessed it at his place of

15   employment, and then you just said school IP address.  So what

16   is Mr. Baldwin's place of employment?

17   A.   He is a pre-kindergarten/kindergarten teacher at the

18   Hockaday School in Dallas.

19   Q.   In the Hockaday School.  So what students, do you know?

20   Is it kindergarten through --

21   A.   It is a private school that is for young women only, and

22   it ranges from pre-K -- I believe it goes up to twelfth --

23   twelfth grade.

24   Q.   So girls of all ages?

25   A.   Yes.  Correct.

1  Q.   And do you know how long Mr. Baldwin has been teaching at
2  that school?
3  A.   He's been at Hockaday -- I believe during the interview he
4  identified seven years, but he's been in education in total for
5  11 years.
6  Q.   Now, I want to focus on Mr. Baldwin's arrest, which I
7  believe you said was Wednesday, the 29th.  So just to be clear,
8  two days ago or --
9  A.   Yes, sir.  That is correct, two days ago.
10  Q.   Okay.  And you referred to a number of statements that
11  Mr. Baldwin made.
12       Can you describe any statements he made about his
13  child porn addiction?
14  A.   Yes.
15       Mr. Baldwin was incredibly forthcoming.  He was the
16  sole occupant of the apartment.  He was -- immediately upon
17  interacting with us, he understood why we were there.  I think
18  he termed it we were for underage sex.  He then clarified we
19  were there for child pornography.
20       He answered our questions, and he provided the
21  information that he was the individual utilizing the Kik
22  account, paying through PayPal, as well as other cash
23  applications from other users, that he would purchase child
24  pornography files from other users.
25       Of concern to me, however, during this interview was

 1     that Mr. Baldwin stated he does have a fantasy for hands-on

 2     with a child, specifically like a boy about 14 years old.

 3             He did tell us that we have nothing to worry about,

 4     that he, in his 11 years of education, has never thought about

 5     touching a child or had touched a child and there were never

 6     any accusations against him.

 7             But two things concern me is that he has this fantasy

 8     to actually hands-on with a minor boy, and then in his

 9     residence we did discover a sexual device that is very small.

10     We questioned him about it during the interview, a very small

11     sexual device that I would estimate would be the genitals,

12     torso, rear-end section of approximately a five- to

13     six-year-old child.

14             Mr. Baldwin explained that he did not purchase that

15     because of the size, he purchased that because it was the

16     cheapest one and that he didn't know the size ratio.

17             But those are just concerning flags to me, that we

18     have an individual that is accessing child pornography files

19     while at school or accessing an application where he is

20     obtaining child pornography files while at school.

21             He admitted to us that he is turned on by child

22     pornography at home, but he said he was not turned on by the

23     child pornography at school, that he would just forget where he

24     was sometimes and access the application.

25             But in totality, he's accessing child pornography

1  while at school.  His sexual interest he said on the phone is

2  predominantly 13 to 14 years old, that we would find files

3  depicting ten years old on his phone.  He's identified

4  particular series of young boys, and he regularly asks for that

5  series.

6          So that, in totality, is -- and that he had been

7  doing this for -- he admitted to us he's been collecting files

8  for four years, but he's had a sexual interest for eight.  And

9  he's been involved in education for 11.

10          So it's concerning to me that an individual with

11  these kind of sexual interests would put himself in a place

12  where he has access to children.

13          And then, lastly, during my review of his phone it

14  appears that there may be some illegal drug use, specifically

15  THC gummies.  I found a lot of pictures where he's -- it looks

16  like his hand.  I don't see his face in any of the pictures,

17  but it looks like his hand.  And there's some communication

18  about Denver and pictures of THC gummies, which I am aware that

19  those are illegal in the state of Texas.

20          So that mixed in with somebody who told us he is

21  struggling with his addiction to child pornography, I become

22  concerned about anybody who is utilizing mind-altering

23  substance while fighting a child addiction.  It just brings a

24  lot of concern for me as an investigator.

25  Q.   His living situation, you described it a couple of times,

1    but what do you understand is Mr. Baldwin's living situation?

2    A.   He lives alone in an apartment complex.

3             On the day of the search warrant we did not see

4    children, but I think it goes without saying that there's

5    likely children living -- we executed, I think, at 6:30 in the

6    morning.  With the COVID, I don't know if there's going to be

7    children leaving at particular hours, but I think it's safe to

8    assume that there may be children in the apartment complex.

9             I know the apartment complex has a swimming pool, so

10   there may be children that hang out at that apartment complex.

11   Q.   I'm sorry, I just want to go back to one more thing.

12            The sexual device that you said approximated a five-

13   or six-year-old's genitals, what was the -- is it a male or

14   female?

15   A.   I don't remember.  It was in plastic when we brought it

16   and showed it, so I didn't -- I didn't look at it too well.

17   Q.   Okay.  All right.  Based on your investigation, Ms.

18   Mullican, do you have an opinion as to whether Mr. Baldwin is a

19   danger to the community?

20   A.   I do just because of the nature of the offense and the

21   fact that he's a teacher, that he's been addicted to child

22   pornography for eight years, pornography in general for eight

23   years, and he puts himself in a situation where he has access

24   to children.

25            I have observed videos on his cellular telephone

1  which are kindergarten-age children, but it's both male and
2  female, and I can see Mr. Baldwin in that video.

3      So although the school is a female school -- I don't
4  know where this video was taken, but I see Mr. Baldwin around
5  young children.

6      He has identified a particular series of young boys.
7  That is concerning to me because he's sexually identified the
8  names of the series.  That alone with the fact that he did this
9  activity while at school, I'm concerned that he would be
10  aroused and then leave the bathroom and go teach these minor
11  children, children of an age that are very vulnerable; that if
12  they were sexually assaulted in any way, I don't think the
13  children would know that that was wrong to be touched in that
14  particular way.

15      And then the fantasy that he has fantasized about
16  hands-on with a child.

17      It appears to me over the course of his activity that
18  he has escalated his interest in the child pornography to the
19  point where it wasn't just child pornography he was seeking,
20  that he was seeking a particular series, and now we learn of a
21  fantasy where he would like to hands-on.  And the activity that
22  he explained that he would like to hands-on with an
23  approximately 14-year-old boy is a felony offense in the state
24  of Texas, so --
25  Q.   And do you have an opinion as to whether Mr. Baldwin is a

1  flight risk?

2  A.   I think his flight risk would be very low, because he was

3  born and raised in Dallas, Texas.

4       He did, during the course of the interview, tell us

5  all his family is here in Dallas, Texas.  However, just the

6  simple fact of the offense, he told there's a stigma that is

7  associated with this offense.  I think that in itself is going

8  to be of concern to him, and it may change his thinking about

9  what he's facing and what could happen from here forward.

10       MR. BASU:  I'll pass the witness.

11       THE COURT:  Mr. Green?

12       MR. GREEN:  Your Honor, may I stay at counsel table?

13       THE COURT:  Yes, please.

14       MR. GREEN:  Thank you.

15                    CROSS-EXAMINATION

16  BY MR. GREEN:

17  Q.   Thank you for being here.

18  A.   Oh, thank you, Mr. Green.

19  Q.   Agent Mullican, do you have any evidence that Mr. Baldwin

20  has touched a child?

21  A.   I have zero evidence at this time.

22  Q.   Any evidence that he's enticed a child?

23  A.   Zero evidence at this time.

24  Q.   Any evidence that he was involved in the production of CP?

25  A.   Zero evidence of any of that, yes, sir.

```
 1   Q.   No evidence that he's ever touched a child at the school?
 2   A.   No, sir.
 3   Q.   Okay.  I want to talk about the day of the arrest.  That
 4   was Wednesday, correct?
 5   A.   That is correct.
 6   Q.   Were you physically there at the arrest?
 7   A.   Yes, sir, I was.
 8   Q.   Okay.  Did you knock on the door?
 9   A.   I did not.  As the interviewer, I usually stay back, but
10   my partners did, yes.
11   Q.   Okay.  And Mr. Baldwin came to the door?
12   A.   Immediately, yes, sir.
13   Q.   Okay.  Did he give y'all permission to go into the home?
14   A.   We had a search warrant.
15   Q.   Okay.
16   A.   We brought him out of the home.
17   Q.   Okay.
18   A.   And then my team went in.  For officer safety they cleared
19   the house.
20   Q.   Okay.  Was there any aggression on Mr. Baldwin's part?
21   A.   None whatsoever.
22   Q.   Was he disrespectful?
23   A.   No, sir, he was not.
24   Q.   Did he try to flee?
25   A.   No, sir, he did not.
```

1    Q.   Okay.  Now, he did talk with y'all, correct?

2    A.   Yes, sir, he did.

3    Q.   And you were the interviewer to speak with Mr. Baldwin,

4    correct?

5    A.   Yes, sir, I was.

6    Q.   Was it just you, or was there others too?

7    A.   No, it was myself and my partner.

8    Q.   Okay.  And where did that occur?

9    A.   Right outside his apartment.  It was a second-floor

10   apartment.  So we spoke to him on the balcony, and then we sat

11   him down on the stairs and just talked to him right outside the

12   door.

13   Q.   And you said this was 6:30 in the morning or 7:00?

14   A.   Between 6:30 -- I think we executed at 6:30, so the time

15   we finally talked to him was probably 6:45, 7:00.

16   Q.   Okay.  Was he honest with you?

17   A.   Yes, sir.

18   Q.   Do you have any evidence that he was minimizing?

19   A.   I don't know if it's evidence that he was minimizing, but

20   he just answered the questions we asked.  And some of the

21   information that we have since found from his forensic review

22   we didn't know at that time.

23   Q.   Okay.  But he answered -- you didn't find anything after

24   your interview that contradicted what he had told you?

25   A.   No, sir, I have not found anything contradictory.

1    Q.   And he told you answers to what you asked him?

2    A.   Absolutely, yes, sir.

3    Q.   Okay.  I'm assuming you Mirandized him, correct?

4    A.   Yes, sir, we did.

5    Q.   Did you record that interview?

6    A.   Yes, sir, we did.

7    Q.   Okay.  Did you tell him that interviewing might be helpful

8    to him?

9    A.   I don't believe that statement was said to him.

10   Q.   Y'all didn't make any mention of cooperation and how the

11   courts might view it?

12   A.   I think we might have -- I don't -- not how the courts

13   might view it.  I think we just asked him or told him that we

14   were there to protect children and that if he had information

15   to help us rescue children that would be helpful.

16   Q.   Okay.  So you said that he was honest with you, right?

17   A.   Yes, sir.

18   Q.   And did you ask him whether he ever touched children?

19   A.   Yes, sir, we did.

20   Q.   And what was his answer to that?

21   A.   That he has never touched a child and that he had no

22   interest in the age of the children that he teaches.

23   Q.   And you believe him?

24   A.   I believe him, yes.

25   Q.   Thank you.

```
1              I believe that you said that the package that
2   contained the genitalia of a five-year-old, six-year-old -- we
3   don't know if it's male or female -- that was in a package?
4   A.   My team packaged it and seized it as evidence, so it was
5   in a plastic bag.  But if that's how they found it, I don't
6   know.
7   Q.   Okay.
8   A.   I didn't go in the apartment.
9   Q.   Do you know if it had been used?
10  A.   He had told us he tried to use it once but that it was too
11  small and he's never used it since.
12  Q.   Okay.  And how long has he had it for?
13  A.   I don't recall if we asked him that.
14  Q.   Okay.
15  A.   Or if he did answer, I don't recall the answer.
16  Q.   Now, I want to be clear.  You said the porn addiction, I
17  believe, started eight years ago?
18  A.   I think the addiction to porn and to child pornography --
19  I don't know if we determined when one or the other started,
20  but he did advise it's been about -- since two years after high
21  school he began to have this porn addiction, that it wasn't
22  just an addiction to child pornography.
23  Q.   I just want to be clear about differentiating between porn
24  and child pornography.
25              Are you saying for eight years he's had a child
```

1   pornography addiction or for eight years he's had a porn

2   addiction?

3   A.   I don't think we clarified.  In his answer it was he's had

4   this interest in children for about eight years, but the

5   addiction came as an addiction in pornography in general and an

6   addiction to child pornography, but I don't think we asked has

7   this been going on for one year, two years, three years.

8   However, he did identify in the interview but for the last four

9   years he's been collecting child pornography.

10  Q.   Okay.  I think you mentioned -- and I appreciate the

11  assessment -- that he was a low risk of flight?

12  A.   Yes, sir, I did.

13  Q.   Okay.  You know that Mr. Baldwin has grown up in Dallas,

14  right?

15  A.   Yes, sir, he told us that.

16  Q.   Okay.  And he's lived in Dallas for the last decade,

17  correct?

18  A.   I don't know if it's a decade.  I know he said that he had

19  lived in his prior apartment for seven years and he's only been

20  in his new apartment for almost a year.  So that's eight years.

21  But I don't know where the prior two years was.

22  Q.   Did you see where he went to college?  I'm not suggesting

23  you should have, but do you know when he went to UTD?

24  A.   No, sir, I don't -- I don't recall that coming up in any

25  of the discussion.

```
 1   Q.   Okay.  If he did go to UTD, you would agree that's in the
 2   Dallas area, right?
 3   A.   Yes, sir, I would.
 4   Q.   Okay.  Did he have any criminal history?
 5   A.   No, sir, he did not.
 6   Q.   You would agree he has family ties here, correct?
 7   A.   He did tell me his whole family lived here.
 8   Q.   Okay.  How long have you been investigating these types of
 9   cases?
10   A.   Since 2013.
11   Q.   So how many detention hearings have you had?
12   A.   Quite a few.
13   Q.   Can you ballpark it?
14   A.   I would say between probably 30 and maybe 50.
15   Q.   Okay.  Have you ever had defendants be released?
16   A.   Yes, sir, I have.
17   Q.   Okay.  You mentioned that you thought he was a danger.
18   Have you ever said at a detention hearing that a defendant
19   wasn't danger in your opinion?
20   A.   No, sir, I do not believe I've said that just because of
21   the nature of the offense.
22   Q.   Okay.  So there are instances where you said someone is a
23   danger and the Court disagreed, correct?
24   A.   Yes, sir.  Yes, sir.
25   Q.   Okay.  Do you know if any of those individuals got
```

```
 1   treatment in the interim?
 2   A.   Oh, no, I wouldn't know that.
 3   Q.   So you were -- but you were at sentencing hearings, right?
 4   A.   Some sentencing hearings I do attend; some I don't.
 5   Q.   So you don't know if anyone who has been released got
 6   treatment after they were released?
 7             MR. BASU:  Objection to relevance.
 8             THE COURT:  It's overruled.
 9   A.   Like post-detention hearing or post-sentencing?
10   Q.   Post-detention hearing, pre-sentencing.
11   A.   I can't say that I do.  I am not aware of that
12   information.
13   Q.   Are you aware of what treatment options are available at
14   the Kaufman County jail?
15   A.   Not specifically at the Kaufman County jail, but I do know
16   that some jail facilities have treatment, you know, sex
17   treatment facilities within them.
18   Q.   You're talking about pre-sentencing options available?
19   A.   I don't know about pre-sentencing.  I think this -- I'm
20   thinking of Seagoville has quite an extensive sex offender unit
21   that provides treatment.  But I'm not familiar -- I think I've
22   been to Kaufman once or twice in the last year or so, the same
23   thing with Fannin, the same thing with Dallas County.  I don't
24   know too much of their internal runnings.
25   Q.   Okay.  Well, let's stick with Seagoville then.
```

```
 1    A.    Okay.
 2    Q.    I have clients there as well.  I've never had a client
 3    with this charge get treatment pre-sentencing there.
 4    A.    Not pre-sentencing.
 5    Q.    Okay.
 6    A.    I believe it's post-sentencing.
 7    Q.    So you're unaware of any treatment options available
 8    pre-sentencing for this type of crime?
 9    A.    I am unaware, yes, sir.
10    Q.    Okay.
11          MR. GREEN:  May I have just one moment, Your Honor?
12          THE COURT:  Sure.
13          (Pause)
14          MR. GREEN:  I pass the witness.
15          Thank you, agent.
16          THE WITNESS:  Thank you.
17          MR. BASU:  Just a couple of questions.
18          THE COURT:  Sure.
19                    REDIRECT EXAMINATION
20    BY MR. BASU:
21    Q.    You were asked questions about the production of child
22    pornography.  I just want to be clear.  You testified --
23    Mr. Baldwin, did he ask for specific images of child
24    pornography?
25    A.    He asked for specific victim series, but he wasn't
```

1    specifically asking for somebody to go -- we did clarify with

2    him in the interview.  He was not paying for files for somebody

3    to go right then and there produce.  He was paying for files

4    that had -- that he knew already existed, and he was asking for

5    those files again.

6    Q.   And in any of his requests did he ever specify or say that

7    he was looking for something like, you know, males of a certain

8    age?

9    A.   Yes.  In his messaging he would ask for teen and preteen

10   male -- preen -- sorry.  Teen and preteen boy-on-boy sucking

11   and fucking.

12   Q.   And then he -- did he make -- did he state whether or not

13   he would pay for those files?

14   A.   Yes, he would.  That was in the communications of the

15   files that he was interested in purchasing.

16   Q.   With regard to the questions about whether Mr. Baldwin was

17   honest in his post-arrest interview, are you aware of -- or do

18   you believe that you've done a full investigation of all

19   accounts that Mr. Baldwin has, all Kik?

20   A.   Oh, absolutely not.  I've looked at one of two phones that

21   he possesses.  I believe there was a computer also in the

22   residence.  He identified that he had multiple Kik accounts.

23   Of concerning the most is he was utilizing a program called

24   Telegram.  And what's concerning to law enforcement is that

25   Telegram program is advertised specifically because it is a

1   program where the user can set the messages to self-destruct.

2          And so we are seeing a particular application be

3   utilized quite frequently with our child offenders because they

4   can set the messages to self-destruct in a day.  And there was

5   a particular chat where Baldwin told another Kik user that he

6   only shares links via Kik, that he actually shares the files

7   via Telegram.  And I believe this is because of the

8   self-destruct feature that can be set on Telegram.

9          Our forensic processing will extract Kik application

10  from the cellular device, but it will not extract Telegram

11  because it's a foreign company and we don't have the code or

12  the Cellebrite company doesn't have that codec, so I will have

13  to do a manual review to see if any of those communications are

14  still there.

15         Further in my review, there was also another

16  application observed in the device installed applications, I

17  believe it was the report, called Wickr.  And Wickr works the

18  same.  And that's spelled W-I-C-K-R.  And that works the same

19  as Telegram, where this is an application that you can set the

20  messages to self-destruct.

21         So that's another application that we are seeing

22  child offenders use because they can set a message that once

23  it's read it is deleted from their phone.  And I believe they

24  do this to avoid detection by law enforcement.

25  Q.   Okay.  Do you know if Telegram can be accessed by a

1  computer?

2  A.   I'm not that familiar with the device.  I know that these

3  are predominantly mobile applications, but if you are tech

4  savvy I believe you can find a way.  I think there's a

5  particular term for it that you can have it mounted.  I have

6  seen forensic agents mount this stuff on computers.  I just

7  don't know how that process works.

8  Q.   Okay.  The same question with Wickr.  Is it --

9  A.   Again, the same process.

10 Q.   So did you ask -- in his post-arrest interview, did you

11 ask Mr. Baldwin to list every single account that he had?

12 A.   We asked him questions about the accounts that he used to

13 do this, and he did identify that Twitter was one, Tumblr was

14 one, Telegram was one, and Kik was one.  But then he was clear

15 to say that if there is more found it's just because he doesn't

16 remember; that he's not trying to deceive us, he just doesn't

17 remember.

18 Q.   And to date have you found additional ones that he didn't

19 specifically state?

20 A.   I believe I have.  I just cannot -- I know -- I know Wickr

21 was one that I observed.  I know Snapchat was also something

22 that I observed.  And I observed this in the Cellebrite report,

23 so I don't -- I can't say that it's still on the phone, but at

24 some point there was either -- the application was installed or

25 there was some kind of activity involving that application on

```
 1    that device.
 2              MR. BASU:  I don't have anything further.
 3              MR. GREEN:  Just briefly, Your Honor.
 4              THE COURT:  Sure.
 5                         RECROSS-EXAMINATION
 6    BY MR. GREEN:
 7    Q.   Any evidence of photos of toddlers?
 8    A.   I have not completed my review.  I believe in the
 9    extraction there is over 10,000 images I have to go through.  I
10    think it actually might be 15,000.  And then there's over 200
11    videos.  So I've only been able to go through a couple of the
12    videos.
13              I think the youngest I would estimate that I have
14    observed is approximately eight years old.  I've observed --
15    Q.   I'm sorry to interrupt.
16    A.   Oh.
17    Q.   So no evidence right now of toddlers?
18    A.   None that I've observed right now, yes, sir.
19    Q.   And I know that you said you have evidence that he bought
20    photos.  Any evidence that he was selling them for money?
21    A.   He was not selling for money, but he was trading multiple
22    links with others, and he even agreed at one time --
23    Q.   Sorry.  To answer my question, no evidence that he was
24    selling?
25    A.   I don't believe I saw evidence that he was selling.
```

1          MR. GREEN:  Nothing further.

2          THE COURT:  Okay.

3          MR. BASU:  One last question.

4                    REDIRECT EXAMINATION

5   BY MR. BASU:

6   Q.   Can you estimate the number of videos and/or pictures that

7   led you -- taken from Mr. Baldwin's cell phone, computer, et

8   cetera?

9   A.   So far, the forensic extracted 15,000 photos, but that's

10  not all child pornography.  I just haven't had a chance to go

11  through those.  It extracted over 200 videos, and I have gone

12  through a handful of those.  So right now I have probably more

13  than 10 videos, but I have not even scratched the surface on my

14  review of just that one device.

15         MR. BASU:  That's it.

16         THE COURT:  Okay.  Thank you, Ms. Mullican.

17         THE WITNESS:  Thank you.

18         THE COURT:  You may step down.

19         (Witness excused)

20         THE COURT:  Mr. Basu, any additional evidence?

21         MR. BASU:  No additional evidence.  I would just like

22  to proffer the presentence report real quick.

23         THE COURT:  Okay.  Very good.

24         Mr. Green?

25         MR. GREEN:  May I step outside and get my witness,

```
 1    Your Honor?
 2              THE COURT:  Sure.
 3              (Pause)
 4              MR. GREEN:  May I approach briefly, Your Honor?
 5              THE COURT:  You may.
 6              If you will go ahead and take a seat, and then I'll
 7    swear you in after you are seated.
 8              (Pause)
 9              THE COURT:  If you could raise your hand to be sworn.
10              (The witness was sworn)
11              THE COURT:  Okay.
12           CHANTE SPRATLING, DEFENDANT'S WITNESS, SWORN
13                         DIRECT EXAMINATION
14    BY MR. GREEN:
15    Q.   Good afternoon.
16    A.   Good afternoon.
17    Q.   Thank you very much for being here.
18              Would you please introduce yourself to the Court?
19    A.   My name is Chante Spratling, and I'm Jason's mother.
20    Q.   Okay.  Ms. Spratling, you and I --
21              THE REPORTER:  Will you spell your name for me,
22    please?
23              THE WITNESS:  First name is C-H-A-N-T-E, and last
24    name is S-P-R-A-T-L-I-N-G.
25    BY MR. GREEN:
```

```
 1   Q.   All right.  Ms. Spratling, where do you live?
 2   A.   In Dallas, North Dallas, on Skillman Street.
 3   Q.   Okay.  And who do you live with?
 4   A.   My husband.
 5   Q.   Any children in the house?
 6   A.   No.
 7   Q.   Okay.  You said that you're Jason's mother?
 8   A.   Yes.
 9   Q.   Where was Jason born?
10   A.   He was born here in Dallas.
11   Q.   Has he ever lived anywhere outside of Dallas?
12   A.   No.
13   Q.   Okay.  Now, you and I spoke on Wednesday; is that correct?
14   A.   Yes.
15   Q.   And I called you and said that there was a serious charge
16   and your son had been arrested?
17   A.   Correct.
18   Q.   That was pretty shocking to you, correct?
19   A.   It was.
20   Q.   Okay.  You and I talked about what it would mean to serve
21   as a third-party custodian, correct?
22   A.   Correct.
23   Q.   Can you tell the Judge your understanding of what that
24   entails?
25   A.   That he would come live with my husband and I, and pretty
```

1  much I would make sure he's doing what he needs to do and doing

2  the right thing.

3  Q.   When you said make sure that he's doing the right thing,

4  if the Judge ordered, for instance, that he not leave the house

5  without permission or that he not access a computer or that he

6  not use any illegal drugs and you found out about those things,

7  what would you do?

8  A.   I would have to report it.  If he's reporting to someone,

9  I have to report it, because he's not doing what's required of

10  him.

11  Q.   And what would happen if you didn't report it?

12  A.   I'm quite sure I would face some type of criminal or legal

13  consequences.

14  Q.   Okay.  Ms. Spratling, have you ever been in trouble with

15  the law?

16  A.   I have.

17  Q.   Can you tell the Court what happened?

18  A.   I was a mother of two, about age 18, and I was receiving

19  food stamps while trying to work a job and wasn't reporting it,

20  so I just got caught up just trying to provide for my kids.

21  Q.   And what happened?

22  A.   I got put on probation, paid restitution, did community

23  service, and completed my probation and haven't been in any

24  trouble since.

25  Q.   So you took your probation seriously?

```
 1  A.   Yes.
 2  Q.   Is that fair?
 3  A.   Yes.
 4  Q.   Okay.  Are there any computers at your house?
 5  A.   I have a computer, but I don't use them.  I used to use
 6  them when my husband owned his own 18-wheeler.  But now that
 7  he's back as a company driver, I very seldom even use them,
 8  so --
 9  Q.   If the Judge ordered that your son not have access to a
10  computer in the house, would you be okay getting rid of the
11  computers?
12  A.   Not an issue.
13  Q.   Okay.  Is there a gun in the house?
14  A.   My husband is a concealed gun license carry, but he keeps
15  his gun with him because he's on the road.
16  Q.   Okay.  If the Judge ordered no firearms in the house,
17  could you make sure that there was no gun in the house?
18  A.   I would.
19  Q.   One of the issues is if your son were let out on bond
20  whether he might be able to see a counselor or get any therapy.
21  Would you support him in that effort?
22  A.   Absolutely.
23  Q.   Would you support him financially in order to get those
24  services?
25  A.   I would do whatever needs to be done in order for him to
```

```
 1    get whatever help he needs to make him a better person.
 2    Q.   And you would tell the Court if he were around any
 3    children when he was ordered not to be?
 4    A.   I would.
 5    Q.   Okay.
 6              MR. GREEN:  That's all I have, Your Honor.  I pass
 7    the witness.
 8              THE COURT:  Thank you.
 9              MR. BASU:  Your Honor, may I do it from here, please?
10              THE COURT:  Yeah, that would be fine.
11                         CROSS-EXAMINATION
12    BY MR. BASU:
13    Q.   Good afternoon, Ms. Spratling.
14    A.   Good afternoon.
15    Q.   Thank you very much for being here.  I do appreciate it.
16    I know it's very difficult circumstances.
17    A.   Thank you.
18    Q.   Ms. Spratling, I don't want to embarrass you, but I do --
19    I would like to know.  You specifically -- you said you had,
20    you know, something where it resulted in probation.  What was
21    the actual offense that you committed?
22    A.   It was something with a secured document.  I was -- I
23    didn't report my income from working.
24    Q.   I see.
25              Ms. Spratling, so you mentioned that your husband
```

1  also lives with you.  Anybody else that lives with you?

2  A.   No.

3  Q.   It's just the two of you?

4  A.   Just my husband and I.

5  Q.   Is it a house or apartment?

6  A.   It's a condo.

7  Q.   It's a condo.

8       How many other units are there in that condo complex

9  ballpark?

10  A.   Maybe in the whole complex maybe -- oh, God, I don't know.

11  Maybe 200 units.  I'm not really sure.  It's not a real big

12  complex.

13  Q.   200 units.

14       Is it a facility where it's one building and all the

15  units are kind of indoors and --

16  A.   No.  We're -- it's -- where I stay is four units on that

17  side and four on the back side.

18  Q.   Do you -- if you know -- I'm sure there are some children

19  in the entire complex?

20  A.   I'm quite sure there is, but in the unit where I'm at,

21  there's no kids that I'm aware of.  I very seldom even see kids

22  playing or running around.

23  Q.   All right.  So, like, in the four units that are in your

24  immediate vicinity, you're not aware of any kids?

25  A.   Correct.

```
 1   Q.   But in the 200 units there very well may be some kids?
 2   A.   There's a possibility, I'm quite sure.
 3   Q.   Ms. Spratling, you said you had a computer, so is it just
 4   one computer?
 5   A.   It's a laptop.
 6   Q.   One laptop?
 7   A.   Yeah.
 8   Q.   Okay.  Do you -- and you said you're okay doing away with
 9   that.  You would be fine getting rid of that if the Court --
10   A.   Yeah, I very seldom -- maybe in a year's time I may open
11   the thing up maybe once or twice, so it's nothing that I use on
12   a regular basis, so it's not an issue.
13   Q.   Okay.  What was your previous employment, if you don't
14   mind me asking?
15   A.   The last employment that I had, I had my own cake business
16   until I had back surgery last year.
17   Q.   Would you consider yourself a computer savvy person?
18   A.   Pretty much I think so.
19   Q.   Okay.
20   A.   My mom, I have to show her how to do stuff on her phone,
21   and I think I'm pretty good with technology.
22   Q.   Okay.  Are you familiar with an application called
23   Snapchat?
24   A.   Snapchat?
25   Q.   Yeah.
```

```
 1   A.   I've heard of it.  I've never been on it, but I have heard
 2   of it.
 3   Q.   What about Wickr, W-I-C-K-R?
 4   A.   No.
 5   Q.   Have you ever heard of an application called Telegram?
 6   A.   No.
 7   Q.   An application called Kik Messenger?  Kik is K-I-K.
 8   A.   No.
 9   Q.   Do you know what -- how often do you see your son?
10   A.   It just depends.  It just depends if we were having family
11   gatherings.
12            I didn't see him as much -- you know, I talk to him
13   more, so -- or text with him more than I saw him.  He was busy;
14   I was busy.  So I couldn't just say how often.
15   Q.   Do you know offhand how many computers are in his house?
16   A.   No, not aware.
17   Q.   How many phones he might have?
18   A.   As far as I know, just probably one phone.
19   Q.   Ms. Spratling, I don't want to get into the details of
20   this, but I do want to ask a question.  You weren't in court
21   earlier.  Are you aware of what your son is charged with?
22   A.   I believe possession of child pornography.
23   Q.   And that is the case.
24            Do you know any of the other specific details of the
25   case?
```

```
 1    A.   No.
 2    Q.   Okay.  Possession of child pornography, you know, just
 3    based on that, do you believe your son did that?
 4             MR. GREEN:  Objection, Your Honor, relevance.
 5             MR. BASU:  If Ms. Spratling is going to be the
 6    custodian over --
 7             THE COURT:  Overruled.
 8             (Pause)
 9             THE WITNESS:  Can you repeat the question?  I'm
10    sorry.
11    BY MR. BASU:
12    Q.   Do you believe your son committed a violation of receiving
13    child pornography?
14    A.   It was hard for me to believe.  It's still hard for me to
15    believe that.
16             MR. BASU:  Pass the witness.
17             MR. GREEN:  Nothing further, Judge.
18             THE COURT:  Okay.  Ms. Spratling, thank you.  You may
19    step down.
20             Thank you for your time.
21             THE WITNESS:  All right.  Thank you.
22             (Witness excused)
23             MR. GREEN:  That's all I have in terms of evidence,
24    Your Honor.
25             THE COURT:  All right.  Mr. Basu, I'll hear your
```

1    argument or rebuttal evidence, then.

2              MR. BASU:  No more rebuttal evidence.

3              THE COURT:  Okay.

4              MR. BASU:  Proceed to argument.

5              THE COURT:  Okay.

6              MR. BASU:  So we're here on a preliminary hearing as

7    well as the detention hearing.  I'll address the preliminary

8    hearing.

9              I do believe that there has been probable cause to

10   establish that Mr. Baldwin was in receipt of child pornography,

11   not only in the objective evidence related to computer evidence

12   but also Mr. Baldwin's own statements post-arrest.

13             With respect to detention, the Government is invoking

14   the rebuttable presumption based on the offense involving minor

15   victims.

16             Judge, even without the rebuttable presumption, I do

17   believe that the Government has proven through clear and

18   convincing evidence that Mr. Baldwin is a danger to the

19   community.  The most troubling aspect is that he had an

20   addiction to child pornography while he was a teacher of young

21   children.

22             Now, we can get caught up in the details of

23   whether -- you know, what his sexual preferences are, you know,

24   who specifically he prefers versus -- one versus the other, but

25   at bottom he had pictures of young boys and girls, and he was

1   teaching young girls.  And just the very nature of his job gave

2   him access to both young boys and girls.

3          He understood his addiction.  He seems to have

4   thought about it enough so that when approached by law

5   enforcement he was able to kind of easily tell law enforcement

6   that he believes he had an addiction to child pornography or to

7   pornography in general for at least eight years, that he's been

8   collecting child pornography for four years.  That's four years

9   where he was a teacher at Hockaday.

10          He could have received treatment.  He could have

11  sought out mental health treatment.  He could have just changed

12  jobs.  There's nothing preventing him from choosing a different

13  profession.  He chose to do none of those things.

14          It's particularly -- particularly upsetting that he

15  had pictures of him with young boys and girls knowing that he

16  had this issue.

17          You know, being a teacher at Hockaday would give him

18  access to young girls of 13, 14, 15.  Hockaday is a school

19  where -- it is an all-girl school, but they have mixers.  There

20  will be occasions of siblings of students.  There will be

21  occasions that he knew of where he would be around young boys.

22          The other particularly troubling aspect is the -- his

23  drug use.  Now, it's not necessarily a huge drug problem, but

24  it is significant in that he admitted to Probation that he had

25  a daily, I would say, addiction, but he used cannabinoids,

1    edibles daily.

2          And as the Court is aware, drug use is a factor.  As

3    Probation has also pointed out, drug use is a factor in

4    determining whether an individual is a danger to the community.

5          Of particular note about his actual offense is it's

6    not just an issue where we can say it happened once or twice.

7    This is for four years multiple messages to multiple

8    individuals, very, very specific requests.  And as Agent

9    Mullican pointed out, it seemed to be escalating.  This was not

10   in its early stages.  This is actually an advanced stage right

11   now.  It is a serious addiction problem by all accounts, as to

12   a certain point, where it is very concerning.

13         Now, as to Ms. Spratling being a custodian, Judge, it

14   is very noble, it's very touching that Mr. Baldwin's mother has

15   offered to do this, has offered to be a custodian.  But,

16   unfortunately, for this defendant, I don't think she is capable

17   of being a custodian.

18         She's not somebody that would be able to tell the

19   Court if she sees Mr. Baldwin on a phone, if she sees

20   Mr. Baldwin accessing, you know, a computer.  She's not going

21   to be able to tell the Court, "Hey, I know that he's not

22   supposed to do that."

23         At this point we don't really know how -- how

24   extensive Mr. Baldwin's -- or how diverse, I guess,

25   Mr. Baldwin's methods are of accessing these accounts.  You

1    know, we're aware of some of these accounts, Kik, Wickr,

2    Snapchat, but Ms. Mullican's investigation is still proceeding.

3    There might be a lot of those accounts out there.  There might

4    be other ways in which Mr. Baldwin can access these accounts.

5             Ms. Spratling, you know, as much as she wants to, as

6    much as I believe that she wants to comply with the Court's

7    orders, I don't believe she's going to be able to comply with

8    the Court's orders.

9             Now, defense made a suggestion basically saying that,

10   you know, Mr. Baldwin is not going to be able to get the help

11   he needs waiting detention pretrial.  And I sympathize with

12   that, but that's not what the Court's objective is here.  It's

13   not to find the best method for Mr. Baldwin to get help.  The

14   Court's objective here is to determine the best way to -- it's

15   to determine whether there are any conditions that will ensure

16   the safety of the community and others.

17            On that score, it does not matter whether Mr. Baldwin

18   will have access to mental health treatment or a facility --

19   mental health facilities or treatments in pretrial detention.

20   The only thing that matters to this Court or the only thing

21   that should matter to this Court is whether there is a way that

22   Mr. Baldwin will offend again if he's in the custody of his

23   mother.  And I just don't see how there are any conditions that

24   the Court can set which would ensure that his mother would be

25   able to properly notify or properly be able to prevent

1    Mr. Baldwin from engaging in the same conduct that he's already

2    been engaging in for four years now.

3            Nothing further.

4            THE COURT:  All right.  Mr. Green?

5            MR. GREEN:  Your Honor, I'll start with flight risk.

6            During my time as a Federal Public Defender, I don't

7    think I've ever had an agent say, "I don't think there's a

8    flight risk in this case."  Agent Mullican did that today, and

9    I think that's a fair characterization of the evidence.

10           Mr. Baldwin grew up here.  He went to college here.

11   He's lived here for the last decade.  His mom is here.  His

12   community ties are here.  That's not the question.

13           The real question, I think, is one of dangerousness.

14   And I'm not minimizing the seriousness of the allegations in

15   this case.  I, of course, understand that being a teacher is an

16   aggravating circumstance that I'm sure concerns the Court and

17   will be taken into account.  But that's not the question.  The

18   question is whether conditions can be set.

19           And the Government is in the minority here, because

20   both the defense and the Probation Department believe that

21   certain conditions can be set that would ensure the safety of

22   the community and also his appearance in court.

23           I think it's fair to say that child pornography cases

24   are on a spectrum.  They're all serious.  In this case we don't

25   have evidence of production.  We don't have evidence of asking

1    children to do certain things.  And I think that's something I
2    would ask the Court to consider.

3          Mr. Baldwin has no criminal history whatsoever.

4          I disagree with the Government's characterization
5    about third-party custodian.  I have seen good third-party
6    custodian candidates; I have seen bad ones.  I think Ms.
7    Baldwin -- Ms. Spratling is no-nonsense.  She's going to be at
8    the house.  The suggestion that she won't know if he's on a
9    computer doesn't match the evidence in the case.

10          The Government asked her whether she is good with
11   technology.  She answered in the affirmative.  Whether or not
12   she knows what Wikr is or Kik is not dispositive.  She knows
13   what a computer looks like.  She knows what a phone looks like.
14   And she explicitly told the Court that if Mr. Baldwin accesses
15   those devices when he's told not to, she will alert the Court
16   and let the Court know.

17          In terms of conditions that can be set, we ask the
18   Court to impose the very conditions that the Probation
19   Department outlined:  no unsupervised contact with any minors,
20   electronic monitoring with curfew as directed by Pretrial, no
21   travel outside the Northern District of Texas, surrendering any
22   passports.

23          The Government alluded to his drug use being a
24   problem.  I think the evidence from the Court -- or from Agent
25   Mullican was that he had edible photos on the phone.  I know

1   what the pretrial report says about his use.  He was honest

2   with the Probation Department.  I would ask the Court to impose

3   a condition to not use that and have testing done.  If he

4   violates, he can be punished in the future and revoked and

5   possibly lose acceptance for that.  But I think marijuana

6   edibles does not equate to someone being so dangerous they

7   cannot be out in the community.

8         I think the other conditions are fair, including not

9   possessing any devices, computer monitoring, smart phones,

10  iPads, gaming consoles, et cetera.

11        Last, Your Honor, I think in cases where someone is

12  not producing child pornography, is not enticing, and needs or

13  could benefit from counseling or therapy, then there is an

14  opportunity for the client to go get that therapy, to get that

15  counseling, which can be helpful both to the community in terms

16  of dangerousness and to that individual and possibly mitigating

17  at sentencing.

18        Ms. Baldwin -- Ms. Spratling said she would aid in

19  that endeavor; that if she could provide any finances to it,

20  she would.  Mr. Baldwin has told me that he does want that and

21  he will pursue it if he's released.  We would ask that that be

22  a condition.

23        Finally, Your Honor, if this is a close question for

24  the Court, I think it's also worth considering that we're in

25  the middle of a pandemic and that COVID for anyone in jail is

1  an aggravating factor, and so we would ask the Court to

2  consider that factor on top of everything else if it's a close

3  question for the Court.

4          That's all I have unless the Court has any questions.

5          THE COURT:  No.  Thank you, Mr. Green.

6          (Pause)

7          THE COURT:  Okay.  We're here for a preliminary and

8  detention hearing as to Mr. Baldwin, who is charged by

9  violating 18 United States Code, Section 2252A(a)(2)(A),

10  receipt of child pornography.

11          I do find based on Special Agent Mulligan's testimony

12  today and the complaint that Mr. Baldwin has -- there is

13  probable cause to believe Mr. Baldwin has committed the offense

14  as alleged in the complaint in this case, and so there's

15  probable cause for this case to go forward.

16          As to the matter of detention, Mr. Baldwin is

17  therefore eligible for pretrial detention because he's charged

18  by complaint.  The Court has now found probable cause to

19  believe he committed the felony under Chapter 110, the child

20  pornography offense which he is charged by complaint and which

21  I find probable cause.

22          The Government has further invoked the so-called

23  rebuttable presumption which applies here.  The Court has found

24  probable cause to believe that Mr. Baldwin has committed this

25  offense involving a minor victim under this specific statute.

1          The law then provides the Court must presume there's

2    no combination of conditions the Court can set to reasonably

3    assure Mr. Baldwin's appearance as required for the safety of

4    the community if he is released.

5          The Government still has the burden to prove that he

6    should be detained.  For this presumption to apply, the defense

7    must come forward with some evidence to rebut the presumption,

8    that is, to suggest that there are conditions that could be set

9    to reasonably assure his appearance as required and the safety

10   of the community if he were to be released.

11         In making a decision today, I have considered Special

12   Agent Mulligan's testimony and the testimony of Chante

13   Spratling, Mr. Baldwin's mother; the complaint; supporting

14   affidavit; and the report of Pretrial Services, all in light of

15   the factors Congress directs the Court to consider, which

16   include the nature and circumstances of the charged offense,

17   the apparent weight of the evidence against Mr. Baldwin, his

18   history and characteristics, and the nature and seriousness of

19   the danger to any other person or the community to be imposed

20   by his release.

21         I find Mr. Baldwin has offered evidence through

22   counsel to rebut the presumption of a flight risk and danger,

23   including through the testimony of his mother and then the

24   testimony -- the testimony on the part of Special Agent

25   Mullican.  He is a lifelong resident of the Dallas area with

 1   his family here, and no one is seriously suggesting he is a

 2   flight risk and that would be a basis for detaining.

 3          Also, I find the mother could serve as a third-party

 4   custodian and keep him from access to smart phones, computers,

 5   and other Internet-capable devices.

 6          Because I find that Mr. Baldwin has come forward with

 7   sufficient evidence to rebut the presumption, the question is

 8   whether there are any combination of conditions the Court could

 9   set to reasonably assure Mr. Baldwin's appearance as required

10   and the safety of the community or any other person if he were

11   released on conditions.

12          Again, the question is really whether there are

13   conditions to be set to reasonably assure the safety of the

14   community and others against Mr. Baldwin engaging or continuing

15   to engage in harmful and unlawful conduct if he were to be

16   released.

17          In particular, the Government has pointed to his

18   dangerousness to the time, the span of time, volume of his

19   collecting child pornography and accessing and trading it, his

20   admitted possession of child pornography, his stated fantasy of

21   contact with young men around 14 years of age, and he's doing

22   all this while he's working as a preschool teacher.

23          Even accounting for those and by no means minimizing

24   both the seriousness of those concerns and obviously the

25   seriousness of the harm and dangers that are inherent in any

1   sort of child pornography conduct and offense, I do find that

2   there are combination of conditions that could be set to

3   reasonably assure the safety of the community and others and

4   Mr. Baldwin's appearance if he was to be released based on --

5   to be included in what the Defendant, Mr. Baldwin, could be

6   required to do now, going forward now, what he's done up to

7   this point, at least the prior situation.

8           So including living with his mother as a third-party

9   custodian, no access to computers or smart phones or other

10  Internet-capable devices, monitoring while on detention, being

11  required to have no contact with any minors, and getting drug

12  testing to address the concerns regarding his THC edible use.

13          So for that reason, based on the conditions that I

14  will now go over, I do find that there are conditions that

15  could be set to reasonably assure Mr. Baldwin's appearance as

16  required and the safety of the community and others.

17          And I will deny the Government's motion for detention

18  and order Mr. Baldwin be released on certain conditions, which

19  I'll now go through.

20          And, of course, Mr. Basu, after I go through these,

21  I'll ask if the Court -- if the Government has anything else I

22  should consider.

23          Mr. Baldwin, as you heard, I'm going to order you be

24  released subject to certain conditions, and I'm going to go

25  through those with you now.

1          While you're on release, you must not violate

2     federal, state, or local law.

3          And you must cooperate in the collection of a DNA

4     sample if it's authorized by federal law.

5          You also must advise the Court or Pretrial Services

6     in writing before you make any change of residence or telephone

7     number; but, in fact, you are required to live with your

8     mother, so simply providing notification is not an option for

9     you.

10          You also must appear in court as required.  And if

11     you are convicted, you must surrender as directed to serve a

12     sentence the Court may impose.

13          I will order that you be in custody of your mother as

14     third-party custodian.

15          And, Mr. Green, do you have Ms. Spratling's address

16     and cell phone number?  Or if not, we can always get them when

17     she's -- I'll just ask you to fill that out, if you can, when

18     you go over this with her.

19          MR. GREEN:  Absolutely.

20          THE COURT:  Okay.

21          MR. GREEN:  I believe that she went to the 13th -- or

22     14th floor, so she's listening right now.

23          THE COURT:  Okay.

24          MR. GREEN:  If she could come back down to this

25     court, that would be helpful.

 1             THE COURT:  Yes, that would be great if she could

 2    come back down.

 3             Mr. Baldwin, I'm also going to order that you submit

 4    to supervision by Pretrial Services.  You and Mr. Green should

 5    visit with them after this hearing.

 6             I'm going to order that you surrender any passport to

 7    the United States District Clerk and not obtain any other

 8    passport or international travel document.

 9             That you reside at that address with your mother as

10    approved by Pretrial Services and restrict your travel to the

11    Northern District of Texas unless you obtain prior permission

12    from Pretrial Services.

13             I'm further going to order that you not possess any

14    firearm, destructive device, or other weapon.

15             Not use or unlawfully possess a narcotic drug or any

16    controlled substance as defined by federal law unless it's

17    prescribed to you by a licensed medical practitioner.

18             You submit to prohibited substance -- you submit to

19    testing for prohibited substance use as directed and required

20    by Pretrial Services.

21             And I order you submit to location monitoring and be

22    subject to home detention, which will restrict you to your

23    mother's residence at all times except for medical, substance

24    abuse, or mental health treatment -- that will include any sex

25    offender treatment that you may be able to obtain -- attorney

1    visits, court appearances, court-ordered obligations, or other
2    activities approved in advance by Pretrial Services.
3            You must pay all or part of the cost of this
4    monitoring program based on your ability to pay as determined
5    by Pretrial Services.
6            I'm further going to order that you not possess any
7    form of pornographic material.
8            You have no unsupervised contact with any minor, more
9    specifically, that you not have any form of unsupervised
10   contact with a person under the age of 18 at any location,
11   including but not limited to, the residence, any place of
12   employment, public places where minors frequent or congregate,
13   without prior permission of Pretrial Services.
14           I'm going to further order that you -- again, being
15   more specific as to what I previously said, you will not
16   possess nor have under your control any pornographic, sexually
17   oriented or other sexually stimulating materials, including
18   visual, audio -- auditory, telephonic or electronic media,
19   computer programs or services.  You will be, of course, on home
20   detention, so I shouldn't have to say all this, but you should
21   not patronize any place where such material or entertainment is
22   available and not use any sexual -- any sex-related telephone
23   numbers.
24           Also, you should not possess or access any mobile
25   electronic communication device capable of connecting to the

```
 1    Internet, including so-called smart phones, iPhones, tablets,
 2    or watches.  You may utilize one device without Internet access
 3    capability for phone calls and texts, flip phone, so long as
 4    such device is approved in advance by Pretrial Services.
 5            You shall not have any access to any computer.
 6            Mr. Basu, are there any other conditions that the
 7    Government would ask that I consider?
 8            MR. BASU:  The Government would ask the Court to
 9    impose a mental health or sex abuse treatment condition.
10            THE COURT:  Oh, yes.  Okay.  Thank you.  Actually,
11    Mr. Green asked for that as well, so thank you for reminding
12    me.
13            (Pause)
14            THE COURT:  As Mr. Basu just reminded me, as
15    Mr. Green specifically suggested in his argument, I will order
16    that you get psychiatric treatment or sex offender treatment as
17    appropriate.
18            Mr. Basu, anything else?
19            MR. BASU:  You know, Your Honor, you said that he's
20    allowed to have access to a phone, a flip phone, without any
21    Internet capabilities.  I believe -- and Agent Mullican can
22    correct me if I'm wrong -- that some of these communications
23    happened over text messages, so --
24            THE COURT:  Oh, I see.
25            Mr. Green, do you have any objection to Mr. Baldwin
```

```
 1    being limited to access to a landline?
 2              MR. GREEN:  Can I have just one moment, Your Honor?
 3              THE COURT:  Sure.
 4              (Pause)
 5              MR. GREEN:  That's not a problem, Your Honor.  Thank
 6    you.
 7              THE COURT:  Okay.  I'm going to remove that
 8    condition, then.
 9              And so to be clear, Mr. Baldwin, when I said earlier
10    that you may use one device without Internet access such as a
11    flip phone, I'm removing that, as we just discussed.
12    Obviously, you can have access to an old-fashioned telephone,
13    landline, in order to take phone calls and communicate with
14    folks.
15              Mr. Baldwin, do you understand these conditions under
16    which I'm releasing you?
17              THE DEFENDANT:  Yes, Your Honor.
18              THE COURT:  Do you have any questions about them at
19    this time?
20              THE DEFENDANT:  I have one question about -- I think
21    when they took my stuff I have, like, my debit card and
22    driver's license.  I don't know if y'all have that or not.  I
23    can --
24              THE COURT:  You can talk with Mr. Green.
25              THE DEFENDANT:  Okay.  Sorry.  Yeah.
```

1          THE COURT:  Okay.  No, that's fine.

2          Do you agree to comply with these conditions?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  The law requires that I advise you of the

5     serious consequences that could follow if you fail to comply,

6     so let me go through those with you now.

7          If you were to fail to appear in court as required,

8     that is a separate crime which you may be sentenced to

9     imprisonment.

10          If you violate any of these conditions of release, a

11     warrant for your arrest may be issued.  You may be jailed until

12     trial and also prosecuted for contempt of court.

13          If you commit a crime while you're on release in this

14     case, it may lead to more severe punishment in that new case,

15     and a new case arises from the crime you committed here, than

16     you would have otherwise received.

17          To put it another way, the fact that you're being on

18     release here could enhance penalties you may receive for

19     comitting a crime while you're on release here.

20          And it is a crime to try to influence, threaten,

21     attempt to bribe, or retaliate against any juror, any witness,

22     or anybody else with information about this case or otherwise

23     obstruct the administration of justice.

24          Mr. Baldwin, do you understand what could happen if

25     you do not follow this condition?

1                THE DEFENDANT:  Yes, Your Honor.

2                THE COURT:  Then I'm going order that Mr. Baldwin be

3       released.

4                Mr. Green, we will need to set up monitoring.  He'll

5       be brought back Monday morning.  Pretrial Services will get him

6       set up with the monitoring equipment, and he will be released

7       at that time.

8                So I will order you be released after processing on

9       Monday, August 3, 2020.

10                I'm signing this order setting conditions of release.

11                I'll hand this down.

12                I ask that, Mr. Green, you go over that with

13      Mr. Baldwin as well as Ms. Spratling.  And there's a place for

14      her to sign the copy on the second page.

15                MR. GREEN:  Okay.

16                THE COURT:  And then sign on the bottom of the third

17      page.

18                MR. GREEN:  Your Honor, will Mr. Baldwin be brought

19      back here for release on Monday?

20                THE COURT:  Yes.

21                MR. GREEN:  Okay.

22                (Pause)

23                THE COURT:  All right.  Ms. Spratling, thank you

24      again for your testimony.

25                Let me just confirm that you understand that you're

1    agreeing by signing this to serve as the so-called third-party

2    custodian for your son, and that means you'll be sure he's

3    living with you and he's in your custody, and you'll be

4    watching to see he's doing everything he's supposed to and not

5    doing the things he's not supposed to do as we discussed here

6    based on his conditions, and you'll inform either the Court or

7    Pretrial Services if, for instance, Mr. Baldwin is either not

8    living with you or doing something he shouldn't be.

9               Do you understand that?

10              MS. SPRATLING:  Yes, sir.

11              THE COURT:  And you agree to do so?

12              MS. SPRATLING:  Yes, sir.

13              THE COURT:  Okay.  Thank you.

14              Mr. Baldwin, let me confirm that by signing here on

15   the third page of this document -- make sure you understand

16   that by signing you're telling the Court you understand all

17   these conditions, you agree to comply with those, and you

18   understand what might happen if you do not?

19              THE DEFENDANT:  Yes, Your Honor.

20              THE COURT:  Okay.  I will order Mr. Baldwin be

21   released on Monday, August 3, 2020, after processing with the

22   United States Marshals and Pretrial Services at that time to

23   hook up with electronic monitoring and he be released to go

24   live with his mother.

25              Mr. Baldwin, do you have any questions about anything

1    we've done here today?

2              THE DEFENDANT:  No, Your Honor.

3              THE COURT:  All right.  Mr. Green, anything further

4    for today?

5              MR. GREEN:  Nothing further.  Thank you, Judge.

6              THE COURT:  For the Government?

7              MR. BASU:  Nothing from the Government.

8              THE COURT:  All right.  Good luck, Mr. Baldwin.

9              The Defendant is ordered released Monday, August 3,

10   2020, subject to that order setting conditions of release.

11             Counsel are excused, and we'll be adjourned.

12             Thank you.

13             MR. BASU:  Thank you, Judge.

14             THE SECURITY OFFICER:  All rise.

15             (Hearing adjourned)

16

17

18

19

20

21

22

23

24

25

```
1                          INDEX

2                                                    Further
                  Direct  Cross  Redirect  Recross  Redirect
3
    WITNESS FOR THE
4   GOVERNMENT

5   JENNIFER MULLICAN    3      19       27        31       32

6                                                    Further
                  Direct  Cross  Redirect  Recross  Redirect
7
    WITNESS FOR THE
8   DEFENDANT

9   CHANTE SPRATLING    33      37

10
    ARGUMENT:  Mr. Basu...................................... 42
11
    ARGUMENT:  Mr. Green..................................... 46
12
    Court's ruling.......................................... 49
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Todd Anderson, RMR, CRR      (214) 753-2170

1        I, TODD ANDERSON, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Dallas Division, hereby certify that the above and

4   foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6        WITNESS MY HAND on this 1st day of September, 2020.

7

8

9
                              /s/Todd Anderson
10                            TODD ANDERSON, RMR, CRR
                              United States Court Reporter
11                            1100 Commerce St., Rm. 1625
                              Dallas, Texas  75242
12                            (214) 753-2170

13

14

15

16

17

18

19

20

21

22

23

24

25